UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| TEODORA COCADIZ,<br><br>Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting Commissioner of Social Security,<br><br>Defendant. | Case No. 17-cv-00190-LB<br><br>**ORDER GRANTING PLAINTIFF'S SUMMARY-JUDGMENT MOTION AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Re: ECF Nos. 12, 13 |

## INTRODUCTION

Plaintiff Teodora Cocadiz seeks judicial review of a final decision by the Commissioner of the Social Security Administration denying her claim for benefits under Title II of the Social Security Act.[1] She moved for summary judgment; the Commissioner opposed the motion and filed a cross-motion.[2] Pursuant to Civil Local Rule 16-5, the court deems this matter submitted for decision by this court without oral argument. All parties consented to magistrate-judge jurisdiction.[3] The court grants Ms. Cocadiz's summary-judgment motion, denies the Commissioner's cross-motion, and

---

[1] Summary-Judgment Motion – ECF No. 12 at 1. Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Cross-Motion – ECF No. 13.

[3] Consent Forms – ECF Nos. 7, 9.

ORDER – No. 17-cv-00190-LB

remands for further proceedings.

**STATEMENT**

**1. Procedural History**

On July 5, 2013, Teodora Cocadiz, then aged 58, filed a disability claim claiming based on spinal problems, sciatica, arthritis, carpal tunnel, fibromyalgia, and an injured rotator cuff.[4] She seeks disability benefits from April 1, 2004 (when she became too disabled to work) through December 31, 2008.[5] The Commissioner denied her claim initially and on reconsideration, and Ms. Cocadiz timely appealed and requested a hearing.[6] On June 3, 2015, the Administrative Law Judge held a hearing and heard testimony from Ms. Cocadiz (represented by counsel) and vocational expert Thomas Linville.[7] On August 17, 2015, the ALJ issued an unfavorable decision for Ms. Cocadiz.[8] On November 15, 2016, the Appeals Council denied Ms. Cocadiz's request for review of the ALJ decision.[9] Ms. Cocadiz timely filed this action on January 13, 2017 and moved for summary judgment.[10] The Commissioner opposed the motion and filed a cross-motion for summary judgment.[11] Ms. Cocadiz then filed her response to the cross-motion.[12]

---

[4] AR 52–53.

[5] Summary-Judgment Motion – ECF No. 12, at 2.

[6] AR 67–80.

[7] AR 33.

[8] AR 17.

[9] AR 1.

[10] Compl. – ECF No. 1; Summary-Judgment Motion – ECF No. 12.

[11] Cross-Motion – ECF No. 13.

[12] Response – ECF No. 14.

## 2. Summary of Record and Administrative Findings

### 2.1. Medical Records

#### 2.1.1. Dr. Manuel Luna: Primary-Care Physician

Dr. Manuel Luna has treated Ms. Cocadiz since April 1999.[13] On May 29, 2001, he referred Ms. Cocadiz for physical therapy at Sedona Therapy.[14] On August 22, 2002, he wrote a report to United Airlines, Ms. Cocadiz's former employer, explaining that Ms. Cocadiz suffered from "bilateral carpal tunnel syndrome, bilateral epicondylitis, overuse syndrome of her shoulders and cervical region, and stress anxiety."[15] He wrote that Ms. Cocadiz had been out of work since May 2002 and that her injuries were work-related.[16] He concluded that "[Ms. Cocadiz's] present medications and psychology visits will make her stronger when she returns to work."[17]

#### 2.1.2. Medical Records from Sedona Therapy: Physical Therapy

Dr. Luna referred Ms. Cocadiz for physical therapy at Sedona Therapy in May 2001 after concluding that Ms. Cocadiz suffered from neck pain, elbow pain, and carpal tunnel syndrome.[18] Ms. Cocadiz went to Sedona Therapy until at least the end of 2006.[19] The Sedona Therapy records contain handwritten "Adult Progress Notes" with Ms. Cocadiz's description of her pain, a practitioner's assessment of her pain and condition, and a treatment plan ("SOAP" notes); it is unclear whether a physical therapist, physician, or other medical professional wrote the SOAP notes because they are largely illegible.[20] One note from November 2006 indicates that Ms. Cocadiz suffered from a cervical strain and diabetes.[21] Another note from June 2006 indicates that

---

[13] AR 401.
[14] AR 404.
[15] AR 356.
[16] *Id.*
[17] *Id.*
[18] AR 406.
[19] AR 411–19.
[20] *Id.*
[21] AR 411.

Ms. Cocadiz reported being able to "climb a difficult hill."[22] Additional notes from the fall of 2005 indicate that Ms. Cocadiz suffered from "knee strains" and "mild degenerative changes," in addition to other indecipherable ailments.[23]

Lab results in the Sedona Therapy records indicate that Ms. Cocadiz suffered from high levels of glucose, glycohemoglobin, and uric acid consistent with diabetes.[24] An x-ray taken of Ms. Cocadiz's cervical spine on November 10, 2006 shows that Ms. Cocadiz suffered from straightening of the lordosis and prior anterior fusion.[25] An x-ray of Ms. Cocadiz's knee on the same date shows degenerative joint disease.[26] X-rays of Ms. Cocadiz's knees from the next week indicate "moderate degenerative changes involving the medial compartment of the left knee," "degenerative changes at the right knee," and "possible loose bodies."[27] An x-ray of Ms. Cocadiz's lumbar spine dated September 19, 2005 shows "mild disc degenerative changes" and "mild degenerative changes" in her left hip.[28]

### 2.1.3. Dr. Vanessa Ortiz: Physiatrist

Dr. Vanessa Ortiz diagnosed Ms. Cocadiz with "severe cervical stenosis" sometime before February 2002 and by May 2002, prescribed Bextra.[29] Dr. Ortiz's May 2002 notes indicate that Ms. Cocadiz had "carpal tunnel splints" and "bilateral thumb spika [*sic*] splints."[30]

On June 10, 2003, Dr. Ortiz referred Ms. Cocadiz for an MRI because she reported experiencing headaches, nausea, neck pain, and bilateral shoulder and arm pain.[31] The MRI

---

[22] AR 416.
[23] AR 421–22.
[24] AR 449–76.
[25] AR 501.
[26] AR 502.
[27] AR 503.
[28] AR 505–06.
[29] AR 336–37, 342.
[30] AR 344.
[31] AR 333.

revealed straightening of the cervical lordosis that possibly indicated muscle spasms and posterior deviation.[32] From November 2003 until April 2003, Dr. Ortiz issued Work Status Reports for Ms. Cocadiz that restricted her from activities involving "heavy lifting" and limited activities involving "keyboarding and mousing" and "power grasping."[33] From April 8, 2003 through July 1, 2003, Dr. Ortiz opined that Ms. Cocadiz must alternate sitting, standing, and walking as tolerated during the workday and work only four hours per shift.[34] Dr. Ortiz prescribed these work restrictions through July 15, 2003 with the additional restriction that Ms. Cocadiz refrain from "prolonged repetitive activities with upper extremities."[35]

On January 22, 2004, Dr. Ortiz imposed permanent restrictions that Ms. Cocadiz refrain completely from lifting, pushing, or pulling over 10 pounds, and using her upper extremities for prolonged periods and prescribed that she be allowed to sit or stand at will.[36] Dr. Ortiz issued the same restrictions on April 6, 2004.[37]

### 2.1.4. Dr. Theodore Baiz: Surgeon

Dr. Ortiz referred Ms. Cocadiz to Dr. Baiz in April 2003.[38] Dr. Baiz diagnosed her with "cervical radiculomyelopathy" and noted that she likely had neck problems the entire time doctors treated her for her arm problems.[39] Dr. Baiz performed spinal surgery on Ms. Cocadiz on August 26, 2003.[40] On September 11, 2003, Dr. Baiz signed a Work Release Certificate advising that Ms. Cocadiz should not return to work until October 15, 2003.[41] On January 12, 2004, Dr. Baiz signed

---

[32] AR 334.
[33] AR 360, 361, 365, 383.
[34] AR 366, 371.
[35] AR 373.
[36] AR 387.
[37] AR 389.
[38] AR 367.
[39] AR 369–70.
[40] AR 374.
[41] AR 377.

ORDER – No. 17-cv-00190-LB      5

a Disability Certificate for Ms. Cocadiz, permitting her to return to work with United Airlines but under the following restrictions: she must not lift anything over 10 pounds and must be "allowed to work standing or sitting at will."[42]

### 2.1.5. Additional Medical Evidence

The administrative record contains additional medical evidence from the Mills Peninsula Health Service Laboratory and Palo Alto Medical Foundation dating from 2010 to 2015. The evidence consists almost exclusively of results from blood tests Dr. Luna ordered to monitor Ms. Cocadiz's diabetes (an ailment she did not allege in her benefits claim).[43] The evidence relates to a period after the undisputed "date last insured" of December 1, 2008, the parties do not address it, and thus the court does not summarize it here. *See Sam v. Astrue*, 550 F.3d 808, 810 (9th Cir. 2008) (disabilities must exist before the "date last insured" to establish entitlement to disability insurance benefits).

### 2.2. Ms. Cocadiz's Testimony

Ms. Cocadiz answered questions from the ALJ and her attorney at the hearing on June 3, 2015.[44] Ms. Cocadiz worked at United Airlines for 16 years, performing clerical duties (including accounting, bookkeeping, payroll, and accounts payable) before transitioning to the badging office, where she worked for her remaining nine years.[45] In the badging office, Ms. Cocadiz issued and collected badges from employees and visitors, and she carried boxes of badges and reams weighing five or six pounds.[46] During an eight-hour work day in the badging office, Ms. Cocadiz sat for a total of six hours.[47] She stopped working for United Airlines after it put her on worker's

---

[42] AR 384.
[43] AR 511–655.
[44] AR 34–51.
[45] AR 36.
[46] *Id*.
[47] *Id.*

compensation following her spinal surgery. The airline subsequently declared bankruptcy and could not offer her light or part-time work.[48] Ms. Cocadiz accepted its offer of enrollment in a retraining program.[49]

Ms. Cocadiz then described the home-based agency for booking cruises that she and her husband started after she stopped working for United Airlines.[50] This work permitted her to be flexible, as she was "living with aches and pains" that continued to bother her.[51] Ms. Cocadiz spent around eight hours a week — with at least one or two hours per day — completing work for the travel agency.[52] After her cervical spine surgery in 2003, she could not work due to "aches and pains," and her "life [was] not normal anymore."[53] A fall in 2006 resulted in a hematoma on her leg for six months.[54] She fell again in 2008 and injured her rotator cuff, and had surgery for the injury in 2010 when conservative treatments failed.[55]

Ms. Cocadiz saw a psychiatrist from April 1, 2004 to December 31, 2008.[56] She took mental-health medications during this time but stopped because the medications "just put [her] to sleep."[57]

Ms. Cocadiz did not return to work after her neck surgery.[58] Problems with her neck continued from 2004 to 2008, causing her "sleepless nights" and problems when sitting or standing in one position.[59] She had to have "regular mobility" so her neck would not be "stiff and itchy."[60] She could not work more than eight hours per week on her travel business due to "a lot of aches and

---

[48] AR 38.
[49] *Id.*
[50] *Id.*
[51] AR 38–39.
[52] AR 39.
[53] AR 39–40.
[54] AR 40.
[55] *Id.*
[56] AR 41.
[57] *Id.*
[58] AR 42.
[59] *Id.*
[60] *Id.*

ORDER – No. 17-cv-00190-LB     7

pains" and depression.[61] As a result, she would have to "lie down," "stretch," "walk," or just "forget" about her aches and pains to deal with the pain during the day.[62] She testified that her fibromyalgia, which Dr. Luna first diagnosed in 1999, also bothered her.[63]

Ms. Cocadiz stated that she received five months' training in hospitality operations as part of the United Airlines workers' compensation program, although she never worked in that field.[64] From the inception of the travel business through 2008, she and her husband made no more than "$15- or $16,000 a year."[65] Ms. Cocadiz majored in marketing and received a Bachelor of Science in Commerce from Far Eastern University in Manila, Philippines.[66]

Ms. Cocadiz identified the parts of her body where she experienced aches and pains as her back and extremities.[67] Since her spinal surgery, her husband cooks, watches her, and helps her with "a lot of the chores."[68] Ms. Cocadiz's husband retired early because of her condition.[69]

### 2.3. Vocational Expert Testimony

Vocational expert Thomas Linville ( the "VE") testified at the hearing on June 3, 2015.[70] He identified Ms. Cocadiz's previous jobs — security-office clerk and travel agent — as sedentary positions.[71] After he reviewed and classified Ms. Cocadiz's past work, the VE answered the ALJ's hypothetical questions. The VE opined that an individual with the capacity of lifting ten pounds and completing an eight-hour workday, if given the option to alternate between sitting and

---

[61] AR 42–43.
[62] AR 43.
[63] AR 43–44.
[64] AR 44–45.
[65] AR 45.
[66] *Id.*
[67] AR 46.
[68] *Id.*
[69] *Id.*
[70] AR 47–51.
[71] AR 47.

ORDER – No. 17-cv-00190-LB            8

standing in 30-minute increments, would be able to perform Ms. Cocadiz's work as a security-office clerk and an independent travel agent.[72] When asked by Ms. Cocadiz's counsel if she could work if she needed to stand or sit "at will" (as compared to 30-minute intervals), the VE indicated that his answer to the first hypothetical might change. Specifically, the VE stated that in "a situation where a person needs to stand for 10 minutes after sitting for ten minutes," the individual would not be able to perform the sedentary job.[73] He described the travel-agent job as being "pretty flexible," but requiring "disproportionate sitting" due to interaction with a computer in a full-time capacity.[74] He acknowledged that the security-clerk job was similar.[75] The VE concluded that "if a person can't be seated six hours a day, by definition they can't do the sedentary job."[76] The VE also stated that if a person could not engage in prolonged activities with the upper extremities, he or she could not complete the regular tasks of a security-office clerk, which involve "frequent reaching, handling, and fingering."[77]

### 2.4 Administrative Findings

The ALJ followed the five-step sequential evaluation process to determine whether Ms. Cocadiz was disabled within the relevant time period and concluded she was not disabled.[78]

At step one, the ALJ found that Ms. Cocadiz did not engage in substantial gainful activity during the period from her alleged onset date of April 1, 2004 through her date last insured of December 1, 2008.[79]

At step two, the ALJ found that Ms. Cocadiz had the following severe impairments: "cervical

---

[72] AR 48.
[73] AR 49.
[74] *Id.*
[75] *Id.*
[76] *Id.*
[77] AR 50.
[78] AR 20–27.
[79] AR 21–22.

ORDER – No. 17-cv-00190-LB                9

spine abnormalities and degenerative joint disease of the knees."[80] The ALJ found that Ms. Cocadiz did not have a medically determinable shoulder or mental impairment because there was no evidence of shoulder complaints and diagnoses or psychiatric treatment.[81]

At step three, the ALJ found that Ms. Cocadiz did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.[82] Specifically, the ALJ found that Ms. Cocadiz's degenerative disc disease did not meet Listing 1.04 because the record did not demonstrate compromise of a nerve root or the spinal cord with additional findings of nerve root compression.[83]

At step four, to determine Ms. Cocadiz's residual functional capacity ("RFC"), the ALJ followed a two-step process. First, he determined whether Ms. Cocadiz suffered from an underlying medically determinable physical or mental impairment (that is, an impairment that could be shown by medically acceptable clinical and laboratory diagnostic techniques) that reasonably could be expected to produce her pain or other symptoms.[84] Second, he evaluated the intensity, persistence, and limiting effects of Ms. Cocadiz's symptoms to determine the extent to which they limited her functioning.[85] The ALJ noted that many of her medical records were from before the relevant time period."[86] He then found that Ms. Cocadiz's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but her statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible because she completed a four-month vocational rehabilitation program in 2004 and "climb[ed] a difficult hill."[87] The ALJ concluded that Ms. Cocadiz had the RFC to perform sedentary work with the exception that she could not lift more than 10 pounds, could not work

---

[80] *Id.*
[81] AR 23.
[82] *Id.*
[83] *Id.*
[84] AR 24.
[85] *Id.*
[86] *Id.*
[87] AR 25.

ORDER – No. 17-cv-00190-LB 10

longer than eight hours in one day, and needed the option to "alternate between sitting and standing, as needed, in thirty-minute increments."[88]

At step five, the ALJ determined that Ms. Cocadiz was capable of performing past relevant work as a security-office clerk.[89] The ALJ therefore concluded Ms. Cocadiz was not disabled.[90]

# ANALYSIS

## 1. Standard of Review

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. District courts may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." 42 U.S.C. § 405(g); *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If the evidence in the administrative record supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *See id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999).

## 2. Applicable Law

A claimant is considered disabled if (1) he or she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the

---

[88] *Id.*

[89] AR 25–26.

[90] AR 26.

"impairment or impairments are of such severity that he or she is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A) & (B). There is a five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520. The five steps are as follows:

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).
>
> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).
>
> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).
>
> **Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).
>
> **Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the commissioner. *See Gonzales v. Sec'y of Health and Human Services*, 784 F.2d 1417, 1419 (9th Cir. 1986).

### 3. Application

Ms. Cocadiz does not challenge the ALJ's conclusion at step three that her condition does not meet the listing. Instead, she contests the ALJ's conclusion at step four that she had the RFC to perform sedentary work with certain limitations.[91] Ms. Cocadiz argues that the ALJ erred by (1) misstating the opinion of Dr. Ortiz, her treating physician, and (2) failing to justify the weight he gave Dr. Ortiz's opinion.[92] For the reasons that follow, the ALJ erred in his RFC finding.

When weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotations omitted). "In conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527).

Social Security regulations distinguish between three types of physicians (and other "acceptable medical sources"): (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [non-examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830).

While an ALJ may disregard the opinion of a treating physician, whether or not controverted, he or she must explain the reason for doing so. *Andrews*, 53 F.3d at 1041. "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (alteration in original)

---

[91] AR 23.

[92] Summary-Judgment Motion – ECF No. 12 at 8–9.

(internal quotations omitted). If the ALJ finds that the opinion of a treating physician is contradicted, the ALJ must provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotations omitted); *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Social Security] Administration considers specified factors in determining the weight it will be given." *Orn*, 495 F.3d at 631. "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)(i)–(ii)) (alteration in original). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided[,] the consistency of the medical opinion with the record as a whole[, and] the specialty of the physician providing the opinion . . . ." *Id.* (citing 20 C.F.R. § 404.1527(d)(3)–(6)).

"[A]n 'ALJ errs when he rejects a medical opinion or assigns it little weight' without explanation or without explaining why 'another medical opinion is more persuasive, or criticiz[es] it with boilerplate language that fails to offer a substantive basis for his conclusion.'" *Ramirez v. Berryhill*, No. 15-CV-02988-LB, 2017 WL 1196728 at *12 (N.D. Cal. Mar. 31, 2017) (quoting *Garrison v. Colvin*, 759 F.3d 995, 1012–13 (9th Cir. 2014).

At step four, the ALJ identified the permanent work restrictions prescribed by Dr. Ortiz on January 22, 2004 as (1) a limitation on lifting, pushing, or pulling over ten pounds and (2) a requirement that Ms. Cocadiz be allowed to "sit and stand at will." Without explanation, the ALJ omitted Dr. Ortiz's prohibition on "prolonged" use of the upper extremities[93] The ALJ noted "the opinion is prior to but also reasonably close to claimant's alleged onset date . . . ."[94] The ALJ

---

[93] AR 25, 387.

[94] AR 25.

then gave Dr. Ortiz's opinion only "some weight" without explaining why.[95] At the end of his decision, the ALJ generically stated there was "no basis" for "additional limitations mentioned in the claimant's representative's hypotheticals."[96]

No evidence in the record contradicts Dr. Ortiz's medical opinion, including the limitations she prescribed. Consequently, to reject Dr. Ortiz's opinion, the ALJ must state "clear and convincing reasons for doing so." *Maganelles v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989); *Montijo v. Sec'y of Health & Human Services*, 729 F.2d 599, 601 (9th Cir. 1984). The ALJ erred because he did not state clear and convincing reasons supported by substantial evidence for giving Dr. Ortiz's opinion only "some weight." His generic conclusion that there was "no basis" for "additional limitations" was not sufficient to reject Dr. Ortiz's opinion and the upper-extremities limitation she prescribed: it is not clear that he rejected Dr. Ortiz's opinion, and if he did, he did not articulate any reason to support that rejection.

Furthermore, the ALJ gave Dr. Ortiz's opinion less than controlling weight without addressing the relevant factors for weighing a treating physician's opinion. *See Garrison*, 759 F.3d at 1012 n.11. The ALJ must consider the "length of the treatment relationship and the frequency of examination, § 404.1527(c)(2)(i), nature and extent of the treatment relationship, § 404.1527(c)(2)(ii), "supportability," § 404.1527(c)(3), consistency, § 404.1527(c)(4), specialization, § 404.1527(c)(5), and other factors that tend to support or contradict the opinion, § 404.1527(c)(6). *Id*. The ALJ did not discuss the fact that Ms. Cocadiz visited Dr. Ortiz, a physiatrist at the Center for Musculoskeletal Medicine, at least twelve times over the course of two years.[97] *See, e.g.*, *Perry v. Colvin*, No. 14-CV-01411-JSC, 2015 WL 1090420 at *11 (N.D. Cal. Mar. 12, 2015) (a physician's two-year treatment relationship with the claimant was sufficient to entitle his opinion to "great weight"). Additionally, the ALJ did not discuss the fact that Dr. Ortiz's opinion was consistent with the diagnoses made by Dr. Luna (the primary-care physician)

---

[95] *Id.*

[96] *Id.*

[97] AR 339, 356, 360–61, 366, 371, 373, 378–79, 383, 387, 389–90.

of bilateral carpal tunnel syndrome, bilateral epicondylitis, and overuse syndrome of her shoulders and Ms. Cocadiz's complaints of neck pain, bilateral shoulder pain, and bilateral arm pain.[98]

Instead, the ALJ relied on a SOAP note in the Sedona Therapy records from June 2006 that Ms. Cocadiz was able to "climb a difficult hill" and successfully completed a four-month vocational rehabilitation program in 2004 without explaining why they outweighed the opinion of the treating physician.[99] For example, the ALJ did not explain how the ability to climb a difficult hill is inconsistent with problems involving the upper extremities. Additionally, the ALJ discredited other SOAP notes because the signatures thereon were illegible, but credited the note from June 2006 irrespective of this problem.[100]

Because the ALJ did not adequately weigh and evaluate the medical-opinion evidence, he erred in his residual-functional-capacity determination.

## CONCLUSION

The court grants Ms. Cocadiz's summary-judgment motion, denies the Commissioner's cross-motion, and remands this case for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: August 28, 2017

_____
LAUREL BEELER
United States Magistrate Judge

---

[98] AR 356.

[99] AR 25 (citing AR 416).

[100] AR 25.